**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**SECURITIES AND EXCHANGE**
**COMMISSION,**

                    **Plaintiff,**

**-vs-**                                     **Case No.  6:06-cv-183-Orl-28KRS**

**PATRICK KIRKLAND, TROPICAL**
**VILLAGE, INC., CLARITY**
**DEVELOPMENT CORPORATION, and**
**SENIOR ADULT LIVING**
**CORPORATION,**

                    **Defendants,**

**SUNSET BAY CLUB, INC.,**
**SUMMERHILL VENTURES, INC.,**
**PELICAN BAY CLUB, INC., and**
**ISLEWORTH ADULT COMMUNITY,**
**INC.,**

                    **Relief Defendants.**

---

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the following motion:

> **MOTION:** **RECEIVER'S SECOND MOTION TO AUTHORIZE SALE OF KIRKLAND'S HOME (Doc. No. 396)**
>
> **FILED:** **January 9, 2008**

**I.      RELEVANT FACTUAL AND PROCEDURAL BACKGROUND.**

On February 16, 2006, the Securities and Exchange Commission ("SEC") filed this complaint seeking injunctive relief, disgorgement, and penalties for alleged violations of the securities laws against Patrick Kirkland, Tropical Village, Inc., Clarity Development Corporation, and Senior Adult Living Corporation (collectively "Defendants").  Other entities owned or controlled by Kirkland were named as Relief Defendants: Sunset Bay Club, Inc. Summerhill Ventures, Inc., Pelican Bay Club, Inc., and Isleworth Adult Community, Inc.  The Court subsequently appointed Judith M. Mercier as Receiver and empowered her to take possession of the assets of Defendants and the Relief Defendants, exclusive of the assets of Kirkland.  Doc. No. 10 ¶ 12.

On March 22, 2006, the Receiver moved to expand the receivership and to authorize sale of property.  Doc. No. 42.  On March 28, 2006, the Receiver filed an amended supplement in support of the motion to expand the receivership.  Doc. No. 55.  The amended supplement alleged that Kirkland used funds from the Defendants or Relief Defendants to pay the $250,000.00 escrow deposit on the single family residence located at 6131 Louise Cove Dr., Windermere, Florida ("the Isleworth home"). Doc. 55 ¶ 7.  Further, the Receiver alleged that the monthly mortgage payments on the Isleworth home were paid with funds from Tropical Village, Inc. and Clarity Development Corporation.  *Id*.

At a hearing held on March 29, 2006, on the motion to expand the receivership, forensic accountant Maria Yip testified that Kirkland used approximately $1,114,000.00 from Tropical Village to make the entire down payment on the Isleworth home.  Hearing Tr., Doc. 418-3 at 90-96 (internal page numbers).  Yip testified further that Kirkland used money from Tropical Village to make the mortgage payments on the Isleworth home.  *Id.* at 96.  Based on this testimony, the Court expanded the receivership to include the Isleworth home.  Doc. 78 at 2-3.

On November 9, 2006, the SEC moved for summary judgment against Kirkland. Doc. No. 188. Evidence submitted by the SEC showed that Tropical Village, Clarity Development, and Senior Adult Living all offered and sold triplexes to investors from 1999 through February 2006, and that Kirkland controlled these entities. Further, nearly all of the cash flow for Tropical Village came from investor down payments on triplex units and sales of triplex units. Declaration of James V. Johnson ("Johnson Decl."), Doc. No. 188-77 ¶ 5. The Chief Financial Officer for Tropical Village attested that funds from Tropical Village were used to pay nearly $1,000,000.00 as a down payment on the Isleworth home and also that it paid the mortgage for the Isleworth home. *Id*. ¶ 6. Yip also attested that funds in the amount of $250,000.00 from Tropical Village were used to pay the escrow on the Isleworth home purchase, and another $864,244.50 for the down payment on the Isleworth home came from Tropical Village. Affidavit of Maria M. Yip ("Yip Aff."), Doc. No. 188-83 ¶¶ 8-9. Yip further attested that funds from Tropical Village, Clarity Development and Senior Adult Living were used to pay the mortgage on the Isleworth home through February 2006. *Id*. ¶ 10. The total amount of these mortgage payments was $368,238.52. Doc. No. 188-83 at 16. Yip attested that Kirkland also used funds from Tropical Village, Clarity Development and Senior Adult Living to pay for homeowners insurance on the Isleworth home ($5,152.26), to pay homeowners' association dues($15,791.00), and to pay for Isleworth Home Services ($42,212.00). Yip. Aff. ¶ 11 & Ex. E.

On September 25, 2007, the Court granted the SEC's motion. Doc. No. 339. The Court determined that Kirkland was "selling unregistered securities through his companies and because he committed securities fraud while offering and selling them, summary judgment must be entered against Kirkland and in favor of the SEC." *Id*. at 36. In a footnote, the Court acknowledged the

abundant evidence that Kirkland used his companies' funds to pay for his personal expenses, including his mortgage. *Id*. at 9 n.5.

Since the inception of the receivership, the Receiver has paid mortgage and escrow payments on the Isleworth house in the total amount of $496,867.64. Affidavit of Judith M. Mercier, Doc. 418-6 ¶ 4. The Receiver has filed her second motion to approve the sale of the Isleworth home based on a contract for sale of the property for $5,050.000.00 with a closing date of April 15, 2008. Doc. No. 396 & Ex. A.[1] Patrick Kirkland objects to the sale of the Isleworth home, arguing that his home is protected from forced sale pursuant to article X, section 4 of the Florida Constitution, and that the motion is premature given the pending appeals. Doc. No. 398.[2]

**II. ANALYSIS.**

Article X, section 4 of the Florida Constitution provides in pertinent part:

(a) There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property owned by a natural person:

(1) a homestead. . . .

---

[1] The Court denied the first motion to sell the Isleworth home, finding that pre-judgment liquidation of assets is rare and the Receiver had not shown an exceptional need to sell the home. Doc. 308. Summary judgment has now been entered against Kirkland.

[2] Kirkland does not cite evidence in the record that he has filed for and obtained a homestead exemption on the Isleworth home. Because neither the Receiver nor the SEC has argued that there is no homestead exemption, I assume for purposes of this Report and Recommendation that the Florida homestead exemption applies to the Isleworth home. If it has not already done so, however, the SEC should confirm the applicability of the exemption to the Isleworth home.

Case 6:06-cv-00183-JA-KRS   Document 436   Filed 03/10/08   Page 5 of 9 PageID 7918

"Florida courts have consistently held that the homestead exemption in article X, section 4 must be liberally construed." *Butterworth v. Caggiano*, 605 So. 2d 56, 58 (Fla. 1992). In general, Florida courts have limited forced sales of homesteads to the three exceptions created by article X, section 4: (1) for the payment of taxes and assessments; (2) for obligations contracted for the purchase, improvement, or repair thereof; and, (3) for obligations contracted for the house, field, or other labor performed on the realty. *Id*. at 60 (no forfeiture of homestead permitted under Florida's RICO statute); *Tramel v. Stewart*, 697 So. 2d 821, 824 (Fla. 1997)(no forfeiture of homestead under Florida's Contraband Forfeiture Act where home acquired from proceeds of illegal drug sales).

In the seminal case of *Jones v. Carpenter*, 106 So. 127 (Fla. 1925), the Florida Supreme Court allowed the trustee of a bankrupt company to have an equitable lien against the homestead of the company's former president who had embezzled corporate funds, which he then used to make repairs and improvements to his homestead. Many years later in *Palm Beach Savings & Loan Association v. Fishbein*, 619 So. 2d 267 (Fla. 1993), the Florida Supreme Court allowed a lender to obtain an equitable lien against a homestead to the extent that the new loan was used to satisfy preexisting mortgages and taxes on the property where the owner had procured the new loan by fraud. However, in *Havoco of America, Ltd. v. Hill*, 790 So. 2d 1018, 1028 (Fla. 2001), the Florida Supreme Court again emphasized that the equitable lien doctrine could override the constitutional homestead exemption "only where the funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead."

Following this line of Florida Supreme Court decisions, the United States Court of Appeals for the Eleventh Circuit affirmed a Bankruptcy Court's order creating an equitable lien on a homestead property purchased with the proceeds of a Ponzi scheme. *In re Fin. Federated Title & Trust, Inc.*, 347

-5-

F.3d 880 (11th Cir. 2003)(hereinafter *Financial Federated*). In reaching this conclusion, the court found that the evidence showed "the investment of fraudulently obtained funds directly to the homestead . . . ." *Id.* at 719. The amount of the equitable lien imposed was the amount of the fraudulently obtained funds invested in the homestead property. *Id.* Because that amount exceeded the equity in the homestead property, the Court permitted the release of all funds obtained from the sale of the homestead property. *Id.*

The facts in this case are remarkably similar to those in *Financial Federated*. In this case, Kirkland knew of and was an active participant in the fraudulent sale of the triplexes to investors. The proceeds of the fraudulent activity were funneled into accounts held by Kirkland's companies, which were then used to purchase and maintain Kirkland's homestead. Thus, there is a direct link between the fraudulent activity and the use of those funds to purchase and maintain Kirkland's home.

As discussed above, approximately $1,114,000.00 in fraudulently obtained funds were used as a down payment to purchase the Isleworth house, and an additional $368,238.52 in fraudulently obtained funds were used to pay the mortgage on the property, all of which were funds used for purposes that are within the express exemption for purchase of property. The Receiver has made an additional $496,867.64 in mortgage payments toward the purchase of the property. Florida law suggests that the homestead exemption would not prevent collection of the additional approximately $58,000.00 in homeowner's fees paid. *See Bessemer v. Gersten*, 381 So. 2d 1344, 1348 (Fla. 1980)(providing that the homestead exemption does not defeat liens arising from fees required to be paid by a resident of a subdivision when such fees were known to the homeowner at the time the

property was purchased).³ Thus, at a minimum, it appears that the Receiver would be entitled to recover more than $2 million dollars from the sale of the Isleworth home.

The imposition of an equitable lien in favor of the Receiver is necessary to prevent Kirkland "from using the homestead exemption as an instrument of fraud and to prevent [Kirkland's] unjust enrichment at the expense of the defrauded investors." *Fin. Federated*, 347 F.3d at 892. Once an equitable lien is imposed, the property may be either sold and the proceeds applied in favor of the lien holder. *Jones*, 106 So. at 412. The Court can hold an evidentiary hearing, if necessary, to determine the amount of the equitable lien should the net proceeds from the sale exceed the amount of funds invested in the home and used to pay assessments thereon as discussed above.⁴

As the instant action is an equitable receivership, the Court is empowered to enter both the equitable lien and to direct the sale of the Isleworth home. The Receiver has complied with the requirements of 28 U.S.C. § 2001 by obtaining, in June 2007, three appraisals on the Isleworth home. Doc. No. 305.⁵ The amount of $5,050,000.00 offered for purchase of the Isleworth home exceeds two-thirds of the appraised value as required by § 2001.

---

³ The *Caggiano* court noted that the *Bessemer* court did not address whether the lien for payment of homeowners' fees was within one of the stated exceptions to the homestead exemption. 605 So. 2d at 60 n.5.

⁴ The proceeds from the sale of the Isleworth home will be reduced by payment of the outstanding mortgage and costs of the sale. The SEC estimates that at the current proposed sale price, the equity in the Isleworth home will likely be less than the amount of the equitable lien. Doc. No. 418 at 10 n.4.

⁵ While these appraisals were made some time ago, the Court can take judicial notice of the decline in the central Florida housing market. Therefore, it does not appear necessary, absent a challenge, to require the Receiver to obtain more current appraisals.

Although Kirkland objects that the motion is premature while his appeals are pending, doc. no. 398 at 2, the only pending appeal relates to the Court's order that held Kirkland in contempt of court for violating the asset freeze. Doc. Nos. 360, 362. Kirkland has not appealed the Court's order dated September 25, 2007, which granted the SEC's motion for summary judgment against Kirkland. No stay preventing the sale of the Isleworth home has been entered. Accordingly, there is no legal impediment to approving the sale of the Isleworth home after conducting a confirmation hearing pursuant to § 2001.

## III.   RECOMMENDATION.

For the reasons stated above, I recommend that, pursuant to 28 U.S.C. § 2001, the Court do the following: (1) schedule a hearing[6] before April 15, 2008, the closing date on the contract for sale, to confirm the sale of Defendant Patrick Kirkland's home; (2) direct the Receiver to provide notice of this hearing to the proposed buyer, any bidders, and any other interested parties in advance of the confirmation hearing, and, (3) require the Receiver to file a certification that this notification has been made at least one business day before the hearing. Provided that the Court is satisfied that the sale is

---

[6] While the Court previously held a § 2001 hearing after notice, that hearing pertained to a different contract of sale at a different sales price. Therefore, it appears necessary for the Court to hold a new confirmation hearing.

appropriate following the hearing, I further recommend that the Court **GRANT** the Receiver's Second Motion to Authorize Sale of Kirkland's Home.

Failure to file written objections to the proposed findings and recommendations contained in this report within **eleven (11) days** from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on March 10, 2008.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy