## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**SECURITIES AND EXCHANGE
COMMISSION,**

**Plaintiff,**

**-vs-**                                                    **Case No.  6:06-cv-183-Orl-28KRS**

**PATRICK KIRKLAND, TROPICAL
VILLAGE, INC., CLARITY
DEVELOPMENT CORPORATION, and
SENIOR ADULT LIVING CORPORATION,**

**Defendants,**

**SUNSET BAY CLUB, INC.,
SUMMERHILL VENTURES, INC.,
PELICAN BAY CLUB, INC., and
ISLEWORTH ADULT COMMUNITY, INC.,**

**Relief Defendants.**
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration after an evidentiary hearing on the following

motion:

| MOTION: | MOTION TO ENFORCE ORDER AND REQUIRE DISBURSEMENT OF RECEIVERSHIP FUNDS (Doc. No. 423) |
|---|---|
| FILED: | February 26, 2008 |

Non-party movant Austell Road Holding, Inc. ("Austell") moves for an order requiring the Receiver to disburse $41,258.17[1] for the pro rata shares of *ad valorem* taxes owed on real property that the Receiver sold to Austell.  The Receiver responded to the motion seeking clarification of an order, submitted to the Court by the Receiver, transferring property owned by relief defendant Summerhill Property Ventures, Inc. to Austell "free and clear of liens."  Doc. No. 423.  After receiving supplemental memoranda of law, doc. nos. 457, 498, 499,  I held an evidentiary hearing on the motion.  Thereafter, the parties filed proposed findings of fact and conclusions of law.  Doc. Nos.  561, 562. The motion has been referred to me for issuance of a Report and Recommendation.

## I.    STATEMENT OF FACTS.

The pertinent facts in the Court record and as developed during the evidentiary hearing are as follows:

*Summerhill Ventures, Inc. and the United Community Bank ("UCB") Loan.*

Summerhill Ventures, Inc. was incorporated in Georgia in June 2000.  Doc. No. 1 ¶ 10.  Bruce Snead was President and Defendant Patrick Kirkland was Secretary of Summerhill Ventures, Inc. *See* Doc. No. 39-3 at 3.[2]  Snead and John Moore, or their spouses, also owned interests in Summerhill Ventures, Inc.  TR. I at 183; Doc. No. 550 ("TR. II") at 100-01.

_____

[1]  As discussed in more detail herein, Austell amended its previous pro rata tax calculation.

[2]  The Georgia Secretary of State records reflect that Patrick Kirkland was the CEO and CFO, John R. Moore was the Secretary, and Bruce Snead was the Registered Agent of Summerhill Ventures, Inc.  *See* Ga. Sec'y of State, http://corp.sos.state.ga.us/ corp/soskb/Corp.asp?26538 (last visited Sept. 8, 2008).

Snead was the builder-contractor of triplexes built on the Summerhill Property. One of Snead's companies, Profile Group, Inc., managed the construction.  TR. I at 10-11, 57-58.

On October 14, 2004, UCB loaned $5,900,000.00 to Summerhill Ventures, Inc. (the "Loan").  Doc. No. 39-3.  Summerhill Ventures, Inc. pledged the Summerhill Property as security for the Loan.  Doc. No. 39-4.  Kirkland, Snead, and Moore were personal guarantors of the Loan.  Doc. Nos. 39-6, 39-7, 39-8.  Under the terms of the Loan, as amended, the principal was decreased to $4,400,000.00, and the maturity date was extended to March 5, 2006.  Doc. No. 39-10.

On February 16, 2006, the SEC initiated this action by filing a complaint and motion for temporary retraining order.  Doc. Nos. 1, 3.  The SEC asserted, and this Court found, that Kirkland fraudulently marketed triplexes developed by Summerhill Ventures, Inc. as investment opportunities.

*The Receivership.*

On February 16, 2006, the Honorable John Antoon, II entered a temporary restraining order which, among other things, restrained and enjoined the defendants and anyone acting in concert or participation with them from "transferring, setting off, receiving, changing, selling, pledging, assigning, liquidating or otherwise disposing of, or withdrawing any assets or property owned by, controlled by, [or] held for the benefit of . . . Summerhill Ventures." Doc. No. 9 at 6-7 (the "Asset Freeze").  Judge Antoon appointed Judith Mercier, Esq., as the Receiver for the corporate defendants and for the relief defendants, including Summerhill Ventures, Inc.  Doc. No. 10.  On February 24,

2006, Judge Antoon issued a preliminary injunction, which incorporated the Asset Freeze.  Doc. No. 29.

*UCB's Motion for Relief from the Asset Freeze.*

On March 6, 2006, UCB notified Summerhill Ventures, Inc. and counsel for the Receiver that it was demanding payment of the Loan and the attorneys' fees that UCB incurred to collect the Loan.  Doc. No. 39-11.  On March 21, 2006, UCB filed a motion seeking relief from the Asset Freeze to permit UCB to collect the monies due under the Loan from Summerhill Ventures, Inc., and from Patrick Kirkland as guarantor; to collect rents paid by tenants at Summerhill Ventures; and to foreclose its mortgage on the Summerhill Property.  Doc. No. 39.  Both the SEC and the Receiver initially opposed the requested relief.  Doc. Nos. 47, 48.  Judge Antoon scheduled a hearing on UCB's motion for April 13, 2006.  Doc. No. 52.

Before the hearing, the Receiver, UCB and their counsel attempted to resolve the motion.  TR. I at 144-48.  The negotiations did not include any discussion of who would be responsible to pay the 2006 *ad valorem* taxes on the Summerhill Property.  TR. I at 199.

At the April 13, 2006 hearing, the participants announced that they had reached a proposed settlement of the issues for approval by the Court. The Receiver proposed to pay UCB the accrued interest on the Loan; to sell the Summerhill Property; and to pay UCB  $100,000.00 as settlement of its attorneys' fees claim. Doc. No. 79; TR. I at 91-92. The proposed settlement did not preclude UCB from continuing to pursue repayment of the Loan by the guarantors.

-4-

Even though UCB represented in its motion that it believed the Summerhill Property was "distressed," doc. no. 39 at 5, 9, based on estimates received from an auctioneer and other information, the Receiver, her counsel and the SEC believed that sale of the Summerhill Property might generate for the receivership estate cash exceeding the amount owed on the Loan and related sales and transfer costs.  Doc. No. TR. I at 125, 149-50, 153-54, 175-76; TR. II at 75-76, 114-15; SEC Ex. 32.

On May 11, 2006, the Court signed an agreed order, which was apparently submitted by the Receiver and UCB.  The order authorized the Receiver to sell the Summerhill Property; to pay to UCB $87,609.70 in accrued interest; and to allow UCB to bid at the auction a credit in the amount of the outstanding Loan balance plus the $100,000.00 attorneys' fees. The order provided expressly that it did not affect any liability of the personal guarantors of the Loan.  Finally, the order provided as follows: "The Receiver is authorized to satisfy the lien of UCB which encumbers the Summerhill Property, from the cash proceeds of the public auction and to pay expenses related to the auction and conveyance of the property; all remaining sale proceeds shall be held until a further order of this Court."  Doc. No. 94.

*Efforts to Sell the Summerhill Property.*

Before the auction, the Receiver and her counsel attempted to negotiate a private sale of the Summerhill Property.  One prospective purchaser offered to pay a significant amount to purchase the property, but he was unwilling to make a downpayment that warranted canceling the auction.  TR. I at 135-36, 141-43, 177-79, 204; TR. II at 115.

Snead and Moore also attempted to purchase the Summerhill Property to protect their interests.  Snead testified that he and Moore were concerned that the Receiver might sell the Summerhill Property at auction for a sum less than was owed to UCB, thus exposing Snead and Moore to liability for a deficiency judgment as personal guarantors.  TR. I at 14-15, 44, 48.  Snead and Moore retained Atlanta attorney Jay Strongwater, Esq., to represent them to attempt to resolve their liability before the public auction.  TR. I at 13.

Snead and Moore, through Strongwater, discussed with the Receiver's attorneys a proposal to pay the receivership estate approximately $200,000.00 less outstanding vendor bills and to assume the Loan. TR. I at 71, 74, 136-37, 195.  The Receiver and the SEC feared that a private sale to the personal guarantors of the Loan would be subject to criticism because Snead and Moore were considered "insiders" as Kirkland's partners in Summerhill Ventures, Inc.  TR. I at 136-37, 177.  This concern caused the Receiver not to pursue Snead and Moore's proposal.  TR. I at 139.

*Agreement between UCB, Snead and Moore,*
*and the Formation of Austell Road Holding, Inc.*

Meanwhile, UCB filed a complaint against Snead and Moore in Georgia state court to collect on their personal guaranties.  TR. I at 12; Affidavit of John Anthony, doc. no. 527 ¶12.  Snead and Moore negotiated with UCB to resolve their liability on the personal guaranties.  TR. I at 58.  UCB, Snead and Moore did not discuss whether UCB would obtain the release of the Summerhill Property from the Asset Freeze to assist Snead and Moore in regaining ownership of the property.  TR. I at 59-60.  Neither the Receiver nor her counsel participated in these negotiations.  TR. I at 40.

On May 31, 2006, UCB, Snead and Moore reached an agreement under which Snead and Moore paid UCB $1,000,000.00 in cash, UCB refinanced the remaining amount owed on the Loan, and UCB assigned to a corporation to be formed by Snead and Moore UCB's right to submit a credit bid at the auction. *See* TR. I at 14-16, 60. Snead and Moore formed Austell, and UCB transferred its right to make the credit bid to Austell.  TR. I at 10, 13, 16.

Shortly before the auction, the Receiver and her attorneys learned that UCB had reached this agreement with Snead and Moore, and that Snead and Moore had formed Austell. TR. I 17.

*The Auction of the Summerhill Property.*

The auction of the Summerhill Property was advertised in a brochure that contained the terms of the auction.  TR. I at 26; Austell Ex. 2.  Among other things, the brochure indicated that the purchaser would be required to pay 10% of the purchase price at the auction and a 10% buyer's premium.  It also provided that taxes would be prorated as of date of closing.  TR. II at 57-58; Austell Ex. 2.  Snead received a copy of this brochure before the auction.  TR. I at 26, 72.  Snead testified that he did not rely on the provision addressing proration of taxes in making the decision to have Austell submit a credit bid at the auction. TR. I at 48.

Before the auction, Strongwater received confirmation from counsel for the Receiver that a credit bidder would not be required to pay the buyer's premium or the deposit described in the brochure, or to reimburse the receivership estate for the interest paid to UCB or other expenses, and that the Summerhill Property would be transferred

"free and clear of liens."  TR. I at 73-74, 79; TR. II at 12-13; Austell Ex. 5; Receiver's Ex.

15.  No one inquired on behalf of Snead, Moore or Austell whether the provision for pro

rata payment of taxes applied to a credit bidder.  TR. I at 74, 84.

On June 1, 2006, the Receiver conducted the auction of the Summerhill Property.

Austell submitted its credit bid.  There were no other bidders.  TR. I 18-19.  The Receiver

deemed Austell to be the successful bidder.  Doc. No. 122 at 2; TR. II at 93.

In the absence of other bidders, the Receiver concluded that it was in the best

interest of the receivership estate to transfer the Summerhill Property to Austell.  The rent

revenues generated from the Summerhill Ventures triplexes were not sufficient to pay the

expenses of maintaining the property, so that the receivership estate had to contribute to

payment of those expenses from other sources.  *See* TR. I at 198-99; TR. II at 77-78, 94-

95.

Counsel for the SEC testified that he did not recall knowing that Austell was formed

by Snead and Moore before the Summerhill Property was transferred to Austell.  TR. I at

180.  He averred that, even if he had known that information, he would have

recommended that the Court approve transferring the property to Austell because the

auction had established the fair market value of the property.  He further testified that the

SEC does not now believe, based on its investigation, that Snead and Moore participated

in Kirkland's fraudulent marketing of the Summerhill Ventures triplexes.  TR. I at 181-82,

188-89.

*Motion to Transfer the Summerhill Property "Free and Clear of Liens."*

Charles Stutts, Esq., is one of the Receiver's attorneys.  He  has substantial experience serving as a receiver and as counsel for receivers.  TR. II at 9-10.  He was tasked with preparing a motion and proposed order to be submitted to the Court to transfer the Summerhill Property to Austell.

Stutts prepared a draft motion and order to transfer the Summerhill Property to Austell "free and clear of liens."  TR. II at 17, 20.  Stutts testified that "free and clear of liens" was his language and that he used this language because that was the language used in other sales of receivership assets in which he had been involved.  TR. II at 14-15, 18-19.  In other cases in which property had been transferred "free and clear of liens," proceeds from the sale of property were used to pay any liens on the property. TR. II at 15.  By the "free and clear of liens" provision, he intended to strip all liens from the Summerhill Property so that the purchaser would take "clear title" to the property.  TR. II at 14,16.[3]  At the time he drafted the motion and order, he did not consider whether *ad valorem* taxes would have to be paid by the Receiver.  TR. II at 16, 19.

---

[3]  In a document filed by the Receiver in response to Austell's motion, the Receiver argued that the motion to transfer the property free and clear of liens "sought only to clear all liens and encumbrances that would have been eliminated had the bank foreclosed its mortgage and to place Austell, as the bank's assignee, in the same position as if the bank had been the successful credit bidder at the auction."  Doc. No. 438 at 4; Receiver's Ex. 34 at 4.  Stutts testified that this did not an accurately represent his intent at the time he prepared the motion. TR. II at 66.  Stutts also testified that he and the Receiver had not discussed the scope of the "free and clear of liens" language before the motion was filed or the proposed order entered by the Court.  TR. II at 65.  The Receiver testified that it was never *her* intention to place Austell in a better position than the bank would have been if it had submitted a credit bid.  TR. II at 87-88.

Before preparing the papers, Stutts asked the Receiver's primary attorney, Brian McDowell, "Do we now present this to the Court for an agreed order approving the sale and transfer free and clear of liens?"  McDowell responded, "You can.  You don't have to because the lender's assignee ended up with the property."  Receiver's Ex. 16.  Regarding this e-mail exchange, McDowell testified that he believed the phrase "free and clear of liens" had no meaning in the context of a credit bid.  TR. I at 211.  Nevertheless, McDowell did not tell Stutts not to include the "free and clear of liens" language in the motion and proposed order.  TR. I at 212.   The Receiver testified that she relied on Stutts regarding the terms of the motion and proposed order and "didn't focus" on the meaning of the phrase at the time.  TR. II at 96, 121-22.[4]

Stutts circulated the draft motion and order for comment.  TR. I at 80.  Stutts, the Receiver, Strongwater, and others, did not discuss the scope of the "free and clear of liens" language as it related to *ad valorem* taxes.  TR. I at 23, 46, 81, 85-87; TR. II at 22, 58, 65.  Everyone consulted agreed to the language of the proposed motion and order.  TR. II at 20-21, 49-50.

Stutts filed the proposed motion and order with the Court.  TR. II at 20-21.  None of the participants advised the Court that Austell was formed by Snead and Moore, who had

---

[4]  The Receiver testified that she now believes that the "free and clear of liens" provision in the motion, order and subsequent fee simple deed is "ambiguous."  In response to a follow-up question by the Court with respect to why the Receiver did not recognize the ambiguity before the papers were prepared and filed, the Receiver testified, "I didn't look at it that closely, Your Honor.  At that point in time . . . there were a number of things going on, and I let the counsel take care of it."  TR. II at 120.

been personal guarantors of the Loan and owners, with Kirkland, of Summerhill Ventures, Inc.  TR. I at 232; TR. II at 123.

On June 29, 2006, Judge Antoon issued the order submitted by the Receiver, and thereby transferred the Summerhill Property to Austell "free and clear of liens." Doc. No. 133 at 2 (hereinafter the "Austell Transfer Order").  When the Austell Transfer Order was signed, the only lien of record on the Summerhill Property was UCB's lien.  TR. II at 76. *Ad valorem* taxes for 2006 were not then due and owing.  TR. I at 23-24.

Another attorney for the Receiver prepared a deed transferring fee simple title to the Summerhill Property to Austell.  TR. II at 62, 120.  The deed provides, in pertinent part, as follows: "The aforesaid conveyance is made subject to all restrictions, liens and encumbrances of record and any matters, facts or circumstances which would be revealed by an current accurate survey of the Property conveyed and an actual on-site inspection of such Property, and otherwise pursuant to that <u>Order Approving the Sale of Summerhill Ventures Property and Transferring Said Property to Austell Road Holding Free and Clear of Liens</u>, dated June 29, 2006, a copy of which Order is attached hereto as <u>Exhibit B</u> and incorporated herein by reference."  TR. II at 46; Receiver's Ex. 22 at 2. The Receiver signed the deed on July 12, 2006.  TR I at 21; Austell Ex. 3.

*Payment of Expenses of Summerhill Ventures, Inc.*

After the auction, Stutts and Strongwater continued to correspond regarding payments owed to various vendors by Summerhill Property, Inc.  TR. II at 24.  Among other things, Stutts wrote to the Georgia Department of Labor advising that, based on the transfer of the Summerhill Property "free and clear of liens," the receivership was

responsible for payment of elevator inspection fees. Austell Ex. 16.  The Receiver also

paid for insurance on the Summerhill Property.  *See* TR. II at 84-85.   Stutts and

Strongwater did not discuss whether the Receiver was responsible for payment of the

2006 *ad valorem* taxes.  TR. II at 24.

*Discussions Regarding Payment of the Ad Valorem Taxes.*

After it acquired the Summerhill Property, Austell obtained loans through which it

repaid the debt owed to UCB.  During the closing of one of those loans, Austell paid the

2006 *ad valorem* taxes on the Summerhill Property.  TR. I at 60, 62-63; Doc. No. 423-2 &

Ex. 1 ¶ 5. Snead testified that the tax payment raised an issue in his mind at the time, but

he failed to assign anyone to pursue repayment of some portion of those taxes by

Summerhill Ventures, Inc. or the Receiver.  TR. I at 63.

Sometime in 2007, as a result of a random internal audit, Snead learned that

Austell had not been reimbursed for that portion of the 2006 *ad valorem* taxes that

accrued on the Summerhill Property before it was transferred to Austell.  TR. I at 27-28.

Snead knew from his experience that the term "free and clear of liens" meant that the

buyer received title to the property with no encumbrances.  TR. I at 23.   Snead directed

Craig Fehr, one of his employees, to obtain reimbursement from the receivership of its

pro rata share of the 2006 *ad valorem* taxes. TR. I at 28-29, 37, 57.

Fehr discussed with Stutts reimbursement of these taxes by the Receiver.  TR. II at

25-31; Receiver's Exs. 24, 27.  Stutts testified that, under general receivership law and 28

U.S.C. § 960[5], he understood that the Receiver was generally obligated to pay the taxes that accrued when the property was within the receivership estate.  TR. II at 28-29, 38, 40-43.  On September 24, 2007, Stutts told Fehr that the receivership estate had sufficient funds to pay the *ad valorem* taxes but that he was unable to get the Receiver to focus on the issue.  TR. II at 30-31.  Meanwhile, Stutts shared his legal research with the Receiver and McDowell, and urged the Receiver to pay the taxes before Austell filed a lawsuit to compel payment of the taxes.  TR. II at 33-34, 36.

At some point, the Receiver expressed the concern that, because the sale of the Summerhill Property had not generated any proceeds, it might be improper for her to use other receivership assets to pay the taxes.  TR. II at 81-82.  In an October 2, 2007 e-mail to Fehr, Stutts acknowledged the validity of Austell's claim[6], but expressed the Receiver's concern about paying the taxes from general receivership assets.  TR. II at 31-35; Receivers' Ex. 29.

*Austell's Motion.*

Having failed to achieve an informal resolution of the *ad valorem* tax issue, UCB filed the present Motion to Enforce Order and Require Disbursement of Receivership Funds.  The motion was supported by affidavits signed by Snead.[7]  A series of

---

[5]  Stutts provided the citation to the United States Code to the Court after the hearing.  *See* TR. II at 71.

[6]  The Receiver did not recall telling Stutts that she recognized the validity of the claim.  TR. II at 81.

[7]  During the evidentiary hearing, Snead corrected some information in the affidavits that he had determined was incorrect.  *See* Doc. No. 560.

memoranda were thereafter filed addressing the issues raised in the motion.  Doc. No. 438, 457, 498, 499, 561, 562.  The Receiver and Austell now agree that the *ad valorem* taxes on the Summerhill Property should be calculated at the rate of $213.77 per day. Doc. No. 561 at 6 n.2; Doc. No. 562 at 24 n.7.  For the period that Summerhill Venture, Inc. owned the Summerhill Property, January 1, 2006 through July 12, 2006, the pro rata taxes would be $41,257.61.[8]

## II.    ANALYSIS.

Austell contends that the Receiver is responsible under Georgia law for payment of the *ad valorem* taxes on the Summerhill Property from January 1, 2006 through July 12, 2006, the date the deed transferring the property to Austell was executed.  It asserts that the language of Austell Transfer Order transferring the property to Austell "free and clear of liens" was not ambiguous.  It argues, alternatively, that if the phrase is ambiguous, the doctrine of *contra preferentum* requires the Court to resolve the ambiguity against the Receiver as the drafter of the document.  Finally, Austell submits that the Receiver should be equitably estopped from arguing that she is not required to pay the *ad valorem* taxes because Austell relied on the "words and deeds" of the Receiver's counsel regarding the receivership's responsibility to pay its share of the *ad valorem* taxes.

---

[8] Austell calculated the taxes for the 193 days between January 1, 2006, and July 12, 2006, as $41,258.17.  The *per diem* rate, $213.77, multiplied by 193 days totals $41,257.61.  It appears that Austell's figure was reached through the following calculation without rounding: Total 2006 tax bill ($78,027.11) divided by days in the year (365) multiplied by 193 days.  *See* TR. I at 31-32.  Because the parties agree on the $213.77 *per diem* rate, I will use the rounded figure of $41,257.61.

The Receiver argues that, because there were no discussions regarding *ad valorem* taxes before the Austell Transfer Order was entered, the phrase "free and clear of liens" should not be construed to apply to the unrecorded *ad valorem* tax lien.  She argues, alternatively, that this Court had no authority to strip the *ad valorem* tax lien from the property.  With respect to the equitable estoppel argument, the Receiver submits that Austell has not shown that it relied on any words or deeds regarding *ad valorem* taxes in deciding to submit the credit bid at the auction.  Finally, the Receiver contends that equitable principles support denial of Austell's motion because the receivership estate did not obtain any proceeds from the sale of the Summerhill Property.

> A.   <u>Under Georgia Law, Both Summerhill Ventures, Inc. and Austell Were Liable for Payment of the *Ad Valorem* Taxes</u>.

The Receiver concedes that an *ad valorem* tax lien arose under Georgia law prior to the transfer of the Summerhill Property.  Doc. No. 499 at 2.  This appears to be a correct reading of Georgia law.

Section 48-2-56(d)(1) of the Georgia Code provides that "[l]iens for any ad valorem taxes shall cover the property of taxpayers liable to tax from the time fixed by law for valuation of the property in each year until such taxes are paid . . . ."  The taxing authority may perfect the lien by filing a writ of *fieri facias* ("Fi. Fa.").  If the lien is not protected by filing a Fi. Fa., it nevertheless remains a statutory lien against the property.  *See In re Jones*, No. 99-53172-JDW, 2000 WL 33740247, at * 1 & n.4 (M.D. Ga. 2000).  It appears that the date fixed by law for valuation of the property is January 1 of each year, which is the date that the property owner must file a return stating the fair market value of the property.  *See* Ga. Code Ann. § 48-5-10; *Jamestown Assocs. v. Fulton County Bd. of Tax*

*Assessors*, 492 S.E. 2d 1, 2 (Ga. Ct. App. 1997).  Therefore, an *ad valorem* tax lien against the Summerhill Property existed at the time the Receiver transferred the property by deed to Austell.

Austell argues that the Receiver was responsible for paying real estate taxes imposed on the property through the date of the deed, citing section  48-2-55(a) of the Georgia Code.  Section 48-2-55(a) provides, "All taxes are a personal debt of the person required by this title to file the returns or to pay the taxes imposed by this title." Georgia law supports Austell's argument, to the extent that the tax assessor could enforce its lien against either the subsequent purchaser or the prior owner of property transferred without payment of the *ad valorem* taxes. *Mulligan v. Security Bank of Bibb County*, 633 S.E.2d 629, 631 (Ga. Ct. App. 2006) (citations omitted); *accord JD Design Group, Inc. v. Graham*, 646 S.E.2d 227, 229 (Ga. 2007).[9]

The owner of the Summerhill Property as of January 1, 2006, was Summerhill Ventures, Inc.  The Receiver controlled Summerhill Ventures as of February 16, 2006, pursuant to orders of this Court.  As such, the Receiver was obligated to pay the *ad valorem* tax obligations of Summerhill Ventures, Inc., for the period that it owned the Summerhill Property.

However, as noted above, Austell would also have been responsible for paying the 2006 *ad valorem* taxes on the Summerhill Property, because the property was transferred

---

[9] Austell cited *Matter of Fulton Air Service, Inc.*, 37 B.R. 358, 361 (N.D. Ga. Bankr. 1984), for the proposition that "a bona fide purchaser of real property in Georgia is not responsible for tax liens that arise prior to the sale of the real property at issue."  Doc. No. 423 at 3.  The subsequent decision of the Georgia Supreme Court in *JD Design Group, Inc.* controls the interpretation of Georgia law.

without payment of those taxes.  The evidence established that Snead, President of Austell, knew that *ad valorem* taxes would be due on the Summerhill Property.  Thus, Austell did not purchase the property without notice of the taxes that would be due.

   B. The Austell Transfer Order Is Not Ambiguous.

   A district court has the power to interpret the language of its original order.  *SEC v. HerMil, Inc.*, 838 F.2d 1151, 1153 (11th Cir. 1988). However, if the order was not ambiguous, the Court cannot change its terms by interpretation unless it has the legal authority to do so.  *Id.*  Accordingly, I begin with an analysis of whether the Austell Transfer Order is ambiguous.

   The only alleged ambiguity in the Austell Transfer Order is the meaning of the term "liens."  Austell argues that, as a matter of law, liens on the Summerhill Property necessarily included the statutory *ad valorem* tax lien. The Receiver contends that because she only intended to clear those liens and encumbrances that would have been eliminated if UCB had foreclosed its mortgage, the Court should construe the order to refer only to recorded liens.  The only recorded lien at the time of the transfer was UCB's lien.

   Because the Court did not hold a hearing regarding the Austell Transfer Order, the record is silent as to the Court's understanding of the term "liens" in that order.  The record does reflect, however, that when the Court (through an order submitted by the Receiver) intended to refer to a specific lien, it did so clearly.  *See* Doc. No. 94 (providing that "[t]he Receiver is authorized to satisfy the lien of UCB which encumbers the Summerhill Property. . . .").

The Receiver's motion seeking entry of the Austell Transfer Order, doc. no. 122, advised the Court that section 363 of the Bankruptcy Code[10], 11 U.S.C. § 363, gave the Court the authority to transfer the property free and clear of liens.  Doc. No. 122 at 3.  If § 363 applies to only certain liens, this statute might provide a basis for limiting the reference to liens to only UCB's recorded lien.  However, § 363(f) is broad enough to cover both UCB's lien and the *ad valorem* tax lien.

Section 363(f) provides as follows:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if --
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding , to accept a money satisfaction of such interest.

UCB consented to the transfer of the property to Austell free of its lien by virtue of its agreement with Austell, including the transfer of the right to submit a credit bid at the auction.  Therefore, § 363(f)(3) permitted the transfer free and clear of the UCB lien.

---

[10]  The provisions of the Bankruptcy Code governing trustees are often relied upon for guidance in this and other receivership cases.

Case law establishes that, in bankruptcy proceedings, § 363(f)(5) permits the sale of property free and clear of tax liens because the Bankruptcy Code provides a mechanism, under 11 U.S.C. § 724(b), to compel a taxing authority to accept a money satisfaction of its tax lien. *See In re Gulf Steel, Inc.*, 285 B.R. 497, 509 (Bkrtcy. N.D. Ala. 2002). Although this is not a bankruptcy proceeding, 28 U.S.C. § 960, which addresses tax liability of court-appointed receivers, specifically incorporates the provisions of the Bankruptcy Code by reference. Accordingly, it appears that the Court had the authority to order transfer the Summerhill Property free of the *ad valorem* tax lien.[11]

Therefore, the reference to § 363 in the Receiver's motion provides no basis to conclude that the reference to liens referred only to the UCB lien.

Finally, even if the Court determined that the meaning of the term "liens" was ambiguous, the extrinsic evidence establishes that Stutts, the lawyer who drafted the Austell Transfer Order, intended the Austell Transfer Order to strip liens of all types from the Summerhill Property. At the time he drafted the proposed order, he did not consider whether some other order might be appropriate when, as here, the sale did not generate proceeds from the receivership estate. Nevertheless, there is no doubt that he intended

---

[11] The Receiver argues, in reliance on *Seaboard National Bank v. Rogers Milk Products Co.*, 21 F.3d 414 (2d Cir. 1927), that the Court did not have authority to strip the *ad valorem* tax lien from the Summerhill Property because there were no proceeds from the sale of the property from which the taxes could be paid. *Seaboard*, which is not binding on this Court, does not stand for the proposition that a court may never sell property free of liens if there are no proceeds from the sale of the property to satisfy the lien. It merely states the general proposition that a court of equity may sell property free of liens and transfer the lien to the proceeds of the sale. *Id.* at 416. In *Seaboard*, the dispute concerned to whom the cash proceeds from the sale of property should be paid.

the Austell Transfer Order to strip the Summerhill Property of all liens, including any *ad valorem* tax liens.

C. The Court's Authority to Modify the Austell Transfer Order.

The Receiver argues that because a receivership is an equitable proceeding, the Court has the ability to modify its orders as necessary in the interests of justice, citing Phillip S. Stenger, *The Receivership Sourcebook* (2d Ed. 2006).  While this treatise addresses the Court's ability to grant relief in an equity receivership in the first instance, it does not address the Court's authority to modify orders already entered.  It appears that the only basis to do so is under Federal Rule of Civil Procedure 60.

Under Rule 60(a), the Court may correct a clerical mistake or mistake arising from oversight or omission on its own motion. "A district court is not permitted, however, to clarify a judgment pursuant to Rule 60(a) to reflect a new and subsequent intent because it perceives its original judgment to be incorrect.'" *Weeks v. Jones*, 100 F.3d 124, 129 (11th Cir. 1996)(quoting *Burton v. Johnson,* 675 F.2d 690, 694 (10th Cir. 1992)).  The record reflects that the Court did not make a mistake, clerical or otherwise, in the order transferring the Summerhill Property to Austell.  The Court entered the order exactly as proposed by the Receiver, and the Receiver's counsel who drafted the order testified that the order stated exactly what he intended it to state.

Rule 60(b)(1) permits a party to move for relief from an order based on mistake, inadvertence, surprise or excusable neglect, but Rule 60(c)(1) requires that such motion be filed no more than one year after the entry of the order in question.   The Court

entered the Austell Transfer Order on June 29, 2006. Doc. No. 13.  The Receiver has not moved for relief under Rule 60(b)(1), and the time has passed for filing such a motion.

Rule 60(b)(6) permits a party to move for relief from an order for "any other reason that justifies relief."  A Rule 60(b)(6) motion does not have to be made within one year after entry of the order.  However, a court may not consider as reasons justifying relief under clause (6) any of the reasons justifying relief under the other five subsections of the rule. *Hall v. State of Ala.*, 700 F.2d 1333, 1338 (11th Cir. 1983) (citing *Klapprott v. United States*, 335 U.S. 601, 614-15 (1949)).  The Receiver has not requested relief under Rule 60(b)(6).

Assuming that the Receiver might yet file a Rule 60(b)(6) motion, I will analyze the application of that rule.  Among the factors courts consider in deciding whether to reopen an order or judgment are the following:

> (1) That final judgments should not lightly be disturbed; (2) that the Rule 60(b) motion is not to be used as a substitute for appeal; (3) that the rule should be liberally construed in order to achieve substantial justice; (4) whether the motion was made within a reasonable time; (5) whether if the judgment was a default or a dismissal in which there was no consideration of the merits the interest in deciding cases on the merits outweighs, in the particular case, the interest in the finality of judgment, and there is merit in the movant's claim or defendant; (6) whether if the judgment was rendered after a trial on the merits the movant had a fair opportunity to present his claim or defense; (7) whether there are intervening equities that would make it inequitable to grant relief; and (8) any other factors relevant to the justice of the judgment under attack.

*Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402 (11th Cir. 1981). The second, fifth and sixth factors are not applicable here.  Accordingly, I will address only the remaining factors.

The first factor, finality of the Court's orders, weighs in favor of Austell.  The Austell Transfer Order was incorporated in the deed transferring the property, which deed has been duly recorded in the public record in Georgia.  Accordingly, Revision of the Austell Transfer Order would potentially cloud the title of the Summerhill Property.

The third factor, achieving substantial justice, supports denial of Austell's motion. As the Receiver correctly argues, Austell succeeded only to the interest UCB acquired in its settlement agreement with the Receiver.  Doc. No. 562 at 22-23.  Under that agreement, UCB was entitled to submit a credit bid which, if successful, entitled UCB to take title to the Summerhill Property and proceed against the individual guarantors to collect the balance due on the Loan.  There was no agreement that the Receiver would satisfy any liens and encumbrances on the Summerhill Property if UCB was the successful bidder.  As such, Austell is attempting to obtain more than it was entitled to as the successor to UCB's interest.

Austell's equitable estoppel argument also bears on the third of the *Seven Elves, Inc.* factors.  The Eleventh Circuit recently defined the elements of equitable estoppel as follows:

> (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation.

*Busby v. JRHBW Realty Inc.*, 513 F.3d 1314, 1326 (11th Cir. 2008).  A party urging the application of equitable estoppel has the burden of proving that all of the elements exist. *Sammons v. Polk County School Bd.*, 165 Fed. Appx. 750, 753 (11th Cir. 2006).

The evidence is undisputed that Austell would have purchased the property irrespective of the Receiver's stated intent to transfer the property free and clear of liens. It is equally undisputed that Austell did not pay the *ad valorem* taxes in connection with the subsequent loan in reliance on the "free and clear of liens" language.  Thus, Austell has not established detrimental reliance on the "free and clear of liens" language in the Austell Transfer Order.

The fourth factor, whether the motion to correct the order was made within a reasonable time, favors Austell.  To date, the Receiver has not filed a motion for relief from the provisions of the Austell Transfer Order.

The seventh factor, intervening equities, also favors Austell.  Austell relied on the "free and clear of liens" language and Stutts' representations that the Receiver recognized her liability for payment of a pro rata share of the *ad valorem* taxes in filing the present motion.

Finally, the eighth factor addressing other facts relevant to the decision favors the Receiver's position.  Because the assets of the receivership estate will be insufficient to repay in full the victims of the fraud described in the complaint, each dollar paid from the estate reduces the funds available to compensate the victims.  However, the interests of the investors also could be protected by deducting from any fees awarded to the Receiver and her counsel any amount the Court orders the Receiver to pay to Austell.

Accordingly, on balance the *Seven Elves* factors favor granting Austell's motion. Thus, this is not a case in which the justification for the relief sought by the Receiver is so compelling that the Court is required to modify the Austell Transfer Order under Rule 60(b)(6).  *See Rice v. Ford Motor Co.*, 88 F.3d 914, 919 (11th Cir. 1996).

## III.    RECOMMENDATION.

For the reasons discussed above, I respectfully recommend that the Court **GRANT** the Motion to Enforce Order and Require Disbursement of Receivership Funds (Doc. No. 423), and **ORDER** the Receiver to pay Austell $41,257.61 as Summerhill Ventures, Inc.'s pro rata share of the *ad valorem* taxes.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on September 9, 2008.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy