**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
(Orlando Division)

**CASE NO. 6:06-CV-183-ORL-28KRS**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| **PATRICK KIRKLAND, et al.,** | ) |
| | ) |
| **Defendants,** | ) |
| | ) |
| **SUMMERHILL VENTURES, INC., et al.,** | ) |
| | ) |
| **Relief Defendants.** | ) |
| | ) |
| _____ | ) |

**SECURITIES AND EXCHANGE COMMISSION'S LIMITED OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION REGARDING APPLICATION OF RECEIVER AND HER COUNSEL FOR FEES AND COSTS**

**I. INTRODUCTION**

Citing an alleged series of missteps and mismanagement of assets, Magistrate Judge Spaulding issued a Report and Recommendation (D.E. 652) that would pay the Receiver and her counsel nothing for more than three years of work on a difficult and, in many ways, unique Receivership. This result would be wholly inequitable. Despite numerous obstacles, many of which the Receiver and her counsel could not have foreseen, they were able to generate assets to distribute to the defrauded victims of Defendant Patrick Kirkland that would not have been available without their work. For those efforts, the Receiver and her law firm deserve compensation.

This is not to suggest the Receiver should receive all of the fees she and her firm, Holland

& Knight LLP, request. Indeed, before the Receiver even submitted her fee applications, she and Holland & Knight reduced their proposed fees at the Commission's behest.[1] Particularly given the fact that there is a limited amount available to distribute to defrauded investors, some reduction in the Receiver's requested fees is appropriate to increase investors' recovery.

Consequently, we do not address many of the Report and Recommendation's (R&R) findings regarding the reasonableness of rates for attorneys and paralegals, or its proposed itemized reductions in fees. The Receiver is in a better position to address those matters. Rather, we write to address three specific recommendations of the Magistrate, which in our view implicate general fairness concerns regarding receivers. If left unchanged, these recommendations could impact the ability of the Commission and the District Courts to find qualified receivers in Commission enforcement actions.

We also object to these three recommendations because they are not based on an accurate reading of the lengthy record in the case. We disagree with the Magistrate's finding that the work of the Receiver and her counsel cost the estate more than $879,000. In addition, the R&R fails to take into account the fact that the District Court approved many of the actions it now challenges. Specifically, we object to the Magistrate's recommendations to reduce the fees of the Receiver and Holland & Knight:

- By $321,485.96 for losses their work on the Summerhill Ventures property allegedly caused;

- By $547,946.56 for losses on the Pelican Bay property their work allegedly caused;

- For all appellate work they performed.

---

[1] The Magistrate correctly notes the Receiver cut the fees she requested for one attorney's work in half at the Commission's request. Report and Recommendation at 4 n.2. However, this is not the only reduction the Commission asked for and the Receiver made. At the Commission's request, the Receiver also reduced fees for some attorneys due to apparent duplication of effort as well as vague time entries.

The Court should decline to adopt these portions of the R&R, and award the Receiver and her counsel reasonable compensation for three years of work.

## II.  GENERAL STATEMENT

As the Receiver describes in more detail in her Objections to the R&R, and as both the Commission and the Receiver have set forth in numerous filings, this has been a Receivership fraught with challenges on many fronts.  To start with, the primary assets of the Receivership were real estate developments in several states, which in many cases were encumbered by mortgages and subject to competing claims of banks, construction companies, and other entities.

Making matters worse, these were not ordinary real estate developments.  Rather, they were novel developments known as triplexes – shared living space for senior citizens – unlike any previously encountered by the Commission, the Receiver, and the real estate experts with whom the Receiver consulted as she attempted to determine what to do with the properties. Deciding what to recommend to the Court therefore required the Receiver to exercise her best judgment without benefit of any similar track record on which to judge the likelihood of success of any particular choice.

Yet another complication relating to these properties was the fact that the national real estate bubble burst almost exactly at the time the Court appointed the Receiver.  Estimates of what properties might bring in a sale or private auction, based on the value of other commercial property sales in the same area, often turned out to be unreliable because the triplexes were unique and due to rapidly declining property values.  That left the Receiver with an even more difficult task of being able to represent to the Court with any certainty how much a particular property might yield for the Receivership.

In addition, Kirkland diverted millions of dollars of investor money from the estate for a

variety of personal expenses. For example, he used investor money to buy houses in the exclusive Isleworth subdivision of Orlando as well as Scotland. He bought several luxury cars, including a Porsche, a Mercedes, and a Jaguar. He paid for country club and gym memberships. He gave millions of dollars to ex-wives, girlfriends, children, and other relatives. *See, e.g.,* D.E. 98 (Commission's Response to Kirkland's Motion to Modify the Order of Preliminary Injunction and Other Relief; D.E. 188 (Commission's Motion for Summary Judgment); D.E. 390 (Commission's Motion for Final Judgment).

Unwinding these transactions was no easy task. As described by the Receiver in her reports to the Court and other documents, the books and records of the Receivership entities were not complete, and required extensive work by forensic accountants to reconstruct and analyze. *See, e.g.,* D.E. 27 (Receiver's First Status Report); D.E. 42 (Motion to Expand Receivership); D.E. 150 (Receiver's Second Interim Status Report).

Kirkland added to the difficulty of the Receiver's task by obstructing her at every turn. For example, despite the Court's decision to place the Scottish castle in the Receivership based on evidence Kirkland had used investor money to buy it, Kirkland refused for almost *two years* and despite Court orders to sign a power of attorney allowing the Receiver to sell the property. The Court had to threaten to hold Kirkland in contempt before he signed the power of attorney. This necessitated numerous motions by the Receiver, both adding to her fees and the overall cost of the estate as the Receiver had to continue to pay the mortgage and other expenses for the house. *See, e.g.,* D.E. 78, 115, 125, 152, 179, 180, 221, 240, 270, 277, 347, 365, 367, 388, 392, 394, 405, 410, 456, and 461.

Kirkland similarly obstructed the Receiver's efforts to sell the Isleworth home. *See, e.g.,* D.E. 135, 139, 153, 255, 261, 289, 297, 363, and 364. And after the Receiver moved to expand

the Receivership to include two checks sent to Kirkland, he continued his dilatory tactics and blatantly violated this Court's asset freeze by cashing the checks. The result was contempt proceedings against Kirkland and another of his many frivolous appeals – all of which added to the cost of the Receivership. *See, e.g.,* D.E. 113, 124, 158, 164, 256, 317, 321, and 360.

As the numerous docket entries above show, the Receiver was extremely vigilant in attempting to marshal assets of the estate and maximize their value. As described in more detail below, the Receiver consistently kept the Court (as well as the Commission) informed of her efforts, and acted only with Court approval. As a result of these efforts, the Receiver and Holland & Knight brought approximately $3 million into the estate to distribute to defrauded investors that would not otherwise have been available. While it is true this money represents only a fraction of the funds investors lost as a result of Kirkland's fraud, it is unfortunately typical in many offering frauds that the defendants dissipate the money they raise long before the Commission and the Receiver get involved. That was certainly true in this case.

Therefore, the R&R's comparison of the Receiver's fees to the money she recovered should not be the only basis on which the Court judges her efforts. The Court should also evaluate the Receiver's actions based on whether they were reasonable at the time she undertook them, particularly given the novelty of the real estate developments involved and the difficulties that created. Such an evaluation should result in the Court awarding the Receiver and her counsel reasonable fees and expenses.[2]

### III. THE SUMMERHILL VENTURES PROPERTY

The R&R twice reduces the proposed fees of the Receiver for her alleged mismanagement of the Summerhill Ventures property in Georgia. R&R at 56-59 (reducing fees

---

[2] The Magistrate's conclusion that the Receiver and her firm have been reasonably paid in comparison to other receiverships is inapposite. The R&R compares the fees the Receiver has already been paid with fees other receiverships have received for three or four months – not three years.

billed for Summerhill Ventures work by $16,900.25), and 59-60 (reducing the lodestar amount by $304,585.71 due to alleged losses on the Summerhill Ventures property the Receiver caused). The Magistrate bases this decision on the Receiver's purported failure to conduct a cost-benefit analysis at the beginning of the Receivership and timely move to abandon the property. *Id.* at 56-60.

This conclusion ignores significant record evidence that the Receiver extensively evaluated options for this property, reported the results to the Court, and, most importantly, received Court approval of her recommendation to retain the property and try to sell it at auction. The R&R's conclusion that the Receiver should have abandoned the property ignores the record evidence that the bank holding the $2.9 million mortgage on it was pressing its claim, and that moving to abandon the property would not have rid the estate of that claim.[3] Indeed, rather than costing the estate money, the Receiver's decision to work with the bank and ultimately get a credit bid at the ensuing auction may have *saved* the estate millions of dollars.

Summerhill was a triplex property in Georgia that Kirkland and two business partners had financed through a loan from United Community Bank in 2004. D.E. 39 at 2-3. At the time the Court appointed the Receiver, some of the triplex units were rented, and the property was generating income. D.E. 48 at 4-5. Immediately after assuming control of the property, the Receiver "employed accountants to, *inter alia*, examine the financial position of the Summerhill Units, directed that a physical inspection of the Summerhill Units occur, investigated options for valuing the Summerhill Units and engaged an auctioneer to develop an expeditious plan to dispose of the Summerhill Units." *Id.* at 4.

Just three weeks after the Court appointed the Receiver, United Community Bank's $2.9

---

[3] For example, the Receiver later moved to abandon the Pelican Bay triplex when efforts to sell it proved unsuccessful. As described in more detail below, the bank and the construction company holding liens on the property continued to press their claim, and the Receiver had to make payments to settle the matter.

million loan balance came due. *Id.* at 4. The Receivership did not have the funds to pay the loan. D.E. 47 at 8 n.4; D.E.. 70-1 at 6. The Receiver immediately began negotiating terms of repayment with the bank. D.E. 47 at 5. Apparently dissatisfied with the progress of those negotiations, the bank moved on March 29, 2006 – barely five weeks after the commencement of the Receivership – to intervene in this action, for an order allowing it to foreclose on the property in Georgia, and for significant attorneys' fees. D.E. 39.

Over the next two weeks, the bank, the Receiver, and the Commission engaged in extensive briefing on the legal interests of the bank and the Receiver in the Summerhill Ventures property, and the Receiver's efforts to evaluate and dispose of the property in the most efficient and expeditious manner possible. D.E. 39, 47, 48, 70, 71, 72, 75. The Court held two hearings on the matter. D.E. 60, 79.

The briefing and the hearings show that in direct contrast to the R&R's conclusions the Receiver did not conduct a cost-benefit analysis on retaining Summerhill Ventures, she conducted as detailed and broad an analysis as possible. She engaged accountants to analyze the income stream. She consulted with real estate agents on the likely value of the property. She had the property physically inspected. She hired an auctioneer to advise her on sale options and to assist in selling the property. D.E. 48 at 4. As the Receiver and the Commission explained to the Court at the April 13, 2006 hearing, valuing the property was difficult because of its unique construction. Nonetheless, the opinions of the auctioneer and the real estate agents were that, based on recent commercial property sales in the area, the Receiver could sell the property for enough to pay off the bank's loan plus interest and make a small profit.

As a result, the Receiver, with the Commission's consent, recommended a resolution of the bank's motion on April 13 that called for, among other things, payment of back interest on

the loan of $87,609.70 and other expenses, and the bank's cooperation in selling the property. D.E. 79. After hearing that explanation and reviewing all of the briefing, the Court approved the recommendation and later memorialized the resolution in an agreed order. D.E. 94.

As the Court knows, the opinions of the auctioneer and the real estate agents proved overly optimistic. The only bid at the ensuing auction on the property was a credit bid – i.e., the amount of the mortgage due – from the bank's assignee. D.E. 122, 133. The Receivership received no cash from the auction, and, in fact, suffered out-of-pocket losses due to the fact that it paid interest on the loan, repaired an elevator and paid an insurance premium while it still held the property, and later had to pay property taxes that came due while it still held the property. R&R at 7-8.[4]

However, the record shows this disappointing outcome was not due to the Receiver's failure to conduct a cost-benefit analysis. As described above, the record shows the Receiver conducted a careful analysis of her options, exercised her best judgment in making recommendations to the Court, explained her rationale to the Court, and received Court approval for her actions. Under those circumstances, it would be inequitable for the Court to penalize the Receiver for the failure of the Summerhill Ventures property to realize more value to the estate.

With the benefit of hindsight, the R&R also concludes the Receiver should have asked the Court to abandon the Summerhill Ventures property rather than selling it. R&R at 56-60. This ignores record evidence that abandoning the property would not have erased the bank's claims against the Receivership, and may well have cost the estate millions of dollars.

As the briefing and hearings set forth above show, even if the Court had allowed the Receiver to abandon the property, the bank would still have had claims against the Receivership

---

[4] The R&R also holds the Receiver responsible for $100,000 in attorneys' fees added to the price of the credit bid and $57,560 in auctioneer fees and expenses to reach its total of $304,585.71 in actual losses to the estate. R&R at 7-8.

8

for the loan, interest, property taxes, and attorneys' fees. There is no evidence in the record to demonstrate the bank would have been any more successful than the Receiver in selling the property, so the record demonstrates a significant likelihood that the bank would have had claims against the estate for some or all of the loan, the interest, the taxes, and other expenses. As a secured creditor, the bank would have stood to collect on those claims ahead of any investors.

Therefore, it is probable that had the Court allowed the Receiver to abandon the property, the estate would have suffered far greater losses than it did on Summerhill Ventures, to the detriment of Kirkland's defrauded investors. The detailed record set forth above yields no basis for the R&R's conclusion that the Receiver erred in not moving to abandon the property sooner. Accordingly, the Court should decline to adopt the R&R's recommendations to reduce the Receiver's fees by $321,485.96 for work related to this property.

## IV.  THE PELICAN BAY PROPERTY

The R&R is similarly incorrect to recommend reducing the Receiver's proposed fees by more than $547,000 due to her alleged improper handling of the Pelican Bay property. As with Summerhill Ventures, the case record reveals a carefully thought-out decision by the Receiver and her counsel to try to realize as much value for the estate as possible by completing construction on the property and selling it. *See, e.g.,* D.E. 274, 374, 375, and 416. Unfortunately, due to the unique nature of the property and the significantly changed real estate market, the decision did not work out as everyone had anticipated. But the record does not support the R&R's recommendation to hold the Receiver responsible for this failure by essentially wiping out any fees she might collect – particularly when the Receiver is not seeking to collect any fees for her work on Pelican Bay.[5]

---

[5] The R&R identifies a few minor entries for Pelican Bay work the Receiver apparently overlooked that the Commission does not object to the Court deducting.

As the record demonstrates, Pelican Bay was a triplex development in Brevard County. D.E. 274 at 2. To fund construction of Pelican Bay, Kirkland had obtained a $10,650,000 non-recourse loan from Banco Popular North America. D.E. 374 at 2. The loan was secured by a first mortgage on the property. *Id.* Notably, at the time the bank agreed to loan Kirkland money in 2005, the project had an "as completed" appraised value of $13.7 million – $3.1 million more than the loan. *Id.*

At the time the Receiver assumed control of the estate in February 2006, construction on Pelican Bay was 42 percent complete. D.E. 300 at 2. The Receiver immediately entered into discussions with the bank and the construction contractor regarding how to proceed with the project. D.E. 300 at 2. This included an analysis of the viability and cost-effectiveness of completing the Pelican Bay property. *Id.*[6] The Receiver determined as a result of these discussions and other research the property had little or no value in its then-existing state. D.E. 351-2; D.E. 384 at 2.

As a result, and since the bank held a non-recourse loan against the Receivership, the Receiver, the bank and the contractor decided the best course of action was to complete the project and then sell it, with the proceeds paying off the loan. D.E. 274, 300, and 374. The Receiver consulted with the Commission at the time about this decision. Based on the Receiver's representations that the property held no value with construction only partially completed, we agreed with the Receiver's decision.

Again, despite the best efforts of the Receiver, the decision to proceed with construction

---

[6] D.E. 300 was a motion by the construction contractor in June 2007 to intervene to assert its right to payment. As the record demonstrates, the contractor and the Receiver at this point were adverse to each other in how the Court should administer the Pelican Bay property. Nonetheless, the contractor noted in its motion the Receiver analyzed the cost-effectiveness of completing Pelican Bay construction. Thus, to the extent the Magistrate is attempting to penalize the Receiver for failing to conduct a cost-benefit analysis on this property, even an adverse party has disagreed with this conclusion.

did not work out as everyone believed. Construction was largely finished, during which time the Receiver paid out about $175,000 in expenses. The Receiver entered into a contract to sell Pelican Bay for about $10.8 million[7] in April 2007. D.E. 274 at 3; D.E. 384 at 5. The buyer, however, breached the contract and failed to close. D.E. 375 at 3-4. The Receiver made additional attempts to sell the property, but could not find another buyer. *Id.* As a result, the Receiver moved to abandon the property in November 2007. D.E. 375.

As subsequent briefing and the R&R detail, that led to a series of claims by the bank, the construction company, and the City of Palm Bay against the Receivership. D.E. 374, 380, 384, R&R at 6-7 and 61-62. The claims were ultimately resolved through a settlement conference in front of the Magistrate, which resulted in the Receiver paying about $302,000 to the bank and the city. R&R at 6-7. The settlement also resulted in the Receiver and Holland & Knight agreeing not to bill the estate for their work on Pelican Bay.

The R&R proposes reducing the Receiver's fees by more than $477,000 as a result of these payments and the expenses the Receivership paid out while it finished construction of the property. *Id.* at 61-62. It proposes an additional $70,000 reduction for fees the Court awarded the special counsel the Receiver retained – with Court approval – after Holland & Knight developed a conflict of interest between its representation of the bank on an unrelated matter and the Receiver when negotiations over the property broke down in November 2007.

The R&R gives two reasons for reducing the Receiver's fees by more than $547,000 – her alleged failure to "more timely" seek to abandon Pelican Bay, and the purported failure to earlier recognize and address the potential conflict between Holland &Knight's representation of the Receiver and the bank. *Id.* at 7.

---

[7] This sales price, down $2.9 million from the appraised value two years earlier, demonstrates the challenges the crashing real estate market caused the Receivership. There was nothing in February 2006, however, to indicate how far the market would ultimately fall.

The R&R fails to support its conclusion that the Receiver did not make a timely decision to move to abandon Pelican Bay. It ignores the record evidence, set forth above, showing the Receiver conducted a detailed evaluation of the costs and benefits of finishing construction versus other options, discussed those options with the bank, the contractor, and the Commission, and made a reasoned decision to proceed. The R&R presumes, without any supporting discussion or citation to the record, that had the Receiver moved to abandon Pelican Bay at the outset of the Receivership, fewer losses would have resulted.

There is no basis in the record for that conclusion. In fact, the record demonstrates that had the Receiver moved earlier to abandon the property, she still would have had to address claims by the bank, the construction company, the city, and possibly other creditors. There is no guarantee those claims would have been resolved for any less than the amounts the Receivership ultimately paid out. In summary, the record does not support the Magistrate's conclusion that the Receiver failed to timely move to abandon Pelican Bay.

The record also contradicts the R&R's findings with regard to the alleged conflict between Holland & Knight's representation of the bank and the Receiver. As the Court knows, this issue was the subject of extensive briefing in early 2008. At that time both the Receiver and the Commission presented evidence and law demonstrating Holland & Knight had no conflict of interest under Florida Bar Rules prior to November 2007. We do not repeat those arguments here, but refer the Court to that briefing. D.E. 409, 411, 412, 416.

In addition, the R&R assumes without any citation to the record that had the Receiver hired outside counsel sooner, the results regarding Pelican Bay would have been any different, or the estate would not have incurred the costs the R&R criticizes. There is a chance hiring special counsel earlier would have cost the estate *more* money, because the Court may have awarded

more than $70,000 to the special counsel without a corresponding reduction in Holland & Knight's bills (since Holland & Knight is not billing for work on Pelican Bay).

In summary, as with Summerhill Ventures, the R&R seeks to hold the Receiver responsible for the fact that good-faith decisions concerning Pelican Bay made after careful consideration failed to yield money for the Receivership. This not only would be an inequitable result in this case, but could make it much more difficult for the Commission and the Court to attract qualified receivers in future enforcement actions. Faced with the possibility that a good-faith decision might wipe out hundreds of thousands of dollars in fees simply because it did not work out as expected, many potential receivers may simply choose not to seek appointments. That could have devastating consequences for the Commission's ability to marshal assets for the benefit of defrauded investors in future cases.

For all these reasons, the Court should not adopt the R&R's recommendation to reduce the Receiver's fees by $547,000 due to her work on the Pelican Bay project.

## V.  THE RECEIVER'S APPELLATE WORK

The final recommendation to which the Commission objects is the R&R's decision to award the Receiver no fees for appellate work. The Magistrate concludes the Receiver's appellate work "unnecessarily duplicated the work that should have been done by the SEC," and therefore concludes the Receiver's counsel should receive no fees for its work on appeals. R&R at 40-41. The record, however, shows the Magistrate's conclusion is wrong. Two of the four appeals Kirkland filed were of orders pertaining to the Receiver's motions; therefore the Receiver *had* to work on the appeals. Work on one of the other appeals also did not duplicate the Commission's work. Accordingly, the Court should not adopt this recommendation.

As the R&R notes, Kirkland filed three interlocutory and one final appeal in this case.

D.E. 137, 362, 477, and 575. The Eleventh Circuit dismissed them all. D.E. 362 was Kirkland's appeal of the District Court's order holding Kirkland in contempt for violating the asset freeze by cashing two checks the Court had awarded to the Receivership. This order was a direct outgrowth of the Receiver's motion to award the checks to the Receivership, and her subsequent joint motion with the Commission to hold Kirkland in contempt for cashing the checks. Thus, the Receiver was the primary appellee in the matter, and had no choice but to file the appropriate briefs in the Eleventh Circuit.

In like fashion, D.E. 477 was an appeal of the Court's order authorizing the sale of Kirkland's house. The Receiver had filed the motion to sell the house. Accordingly, the Receiver's counsel again was required to perform appellate work.

The other appeals more directly involved the Commission. D.E. 137 was Kirkland's appeal of the Court's order refusing to modify the preliminary injunction to lift the asset freeze. Plainly the Commission was the primary appellee in this instance. But as detailed in the Receiver's objections, the Receiver was required to brief the issue of her jurisdiction to proceed with actions to marshal assets while the appeal was pending. Only the final appeal – of the order granting a final judgment of disgorgement, prejudgment interest, and a civil penalty – exclusively involved the Commission. D.E. 575.

Against this record, there is no basis for the R&R's conclusion that the Receiver's appellate work duplicated the Commission's. There is therefore no basis for the recommendation that the Receiver's counsel not be paid for *any* of its appellate work. Rather, the Court should award the Receiver's counsel reasonable fees performed for its work on the first three appeals – D.E. 137, 362, and 477 – all of which involved the Receiver and Receivership

issues.[8]

## VI. CONCLUSION

The R&R unfairly penalizes the Receiver for undertaking actions for which she had received Court approval, and for circumstances beyond her control. The Receiver and Holland & Knight deserve reasonable compensation for their efforts over three years from July 2006 through June 2009. The District Court should reject the R&R's recommendations to reduce the Receiver's fees: (1) $321,485.96 for her Summerhill Ventures work; (2) $547,946.56 for work on Pelican Bay; and (3) for all appellate work. That would leave an award of fees in the vicinity of the reduced lodestar amount cited in the R&R on Page 54. Given the fee reductions the Receiver agreed to at the Commission's request and that the R&R proposes to that point, an award of fees in that range would be less than half of the fees the Receiver and her counsel incurred. That would be more equitable in light of all the circumstances in the case, including the limited amount available for investors.

Respectfully submitted,

March 15, 2010            By:     s/Robert K. Levenson
                                  Regional Trial Counsel
                                  Florida Bar No. 0089771
                                  Direct Dial: (305) 982-6341
                                  levensonr@sec.gov

                                  Attorney for Plaintiff
                                  **SECURITIES AND EXCHANGE COMMISSION**
                                  801 Brickell Avenue, Suite 1800
                                  Miami, Florida 33131
                                  Telephone: (305) 982-6300
                                  Facsimile: (305) 536-4154

---

[8] The total the Receiver's counsel billed for appellate work depends on what hourly rates the Court uses. If it uses the Receiver's proposed rates, the total comes to $49,244. If it adopts the R&R's proposed rates for appellate counsel, the amount is $40,498.50.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 15, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Judith M. Mercier, Receiver
Brian A. McDowell, Esq.
Holland & Knight
200 South Orange Avenue
Suite 2600
Orlando, FL 32801
Telephone: 407/425-8500
Facsimile: 407/244-5288

Daniel D. Mazar, Esq.
2153 Lee Road
Winter Park, FL 32789
Telephone: (407) 645-5352
Facsimile: (407) 645-3224

and that on March 15, 2010, I served the foregoing document and the notice of electronic filing by FedEx to the following non-CM/ECF participant:

Mr. Patrick Kirkland
# 67468 C-1101-L
River Junction Work Camp
300 Pecan Lane
Chattahoochee, FL 32324

                                                   s/Robert K. Levenson
                                                   Robert K. Levenson, Esq.